**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **APRIL GIBSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:05-CV-125** |
| | ) | |
| **JO ANNE B. BARNHART, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

## I. INTRODUCTION

Plaintiff April Gibson seeks judicial review[1] of the final decision of the Defendant

Commissioner of Social Security, Jo Anne Barnhart, who found that Gibson was not entitled to

Supplemental Security Income ("SSI") or Social Security Disability Insurance Benefits ("DIB").

As the reader will soon learn, Gibson's appeal is unsuccessful.

In short, the ALJ's determinations that the opinion of Gibson's psychiatrist was not

entitled to great weight, that the opinion of the consulting examiner was entitled to little or no

weight, and that Gibson's testimony was not credible were supported by substantial evidence.

The Commissioner's final decision, therefore, will be AFFIRMED.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

At the time of her hearing on March 18, 2004, before the Administrative Law Judge

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] The administrative record in this case is voluminous (267 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

("ALJ"), Gibson was twenty-seven years old. (Tr. 243.)  She held various part-time and summer jobs until she graduated from high school in June 1996. (Tr. 54, 62.) She then went directly into the work force, working as a cook's aid from June 1996 to November 1996 and as a molder in a factory from November 1996 until she was laid off in February 1997. (Tr. 62, 117, 249.) A temporary service placed her as an assembler in a factory in April 1997, but Gibson left in September 1997 because she was pregnant. (Tr. 62, 248-49.)

Just two months after returning to the work force in January 2000, Gibson quit her job at a restaurant, purportedly due to anxiety attacks. (Tr. 62, 249.) She attempted to work again in May 2000; however, she was fired in August 2000 after being accused of spreading rumors. (Tr. 247.) In May 2001, Gibson worked for two days at a factory. (Tr. 49.) Her final attempt at work came in August 2002, when she worked for four weeks at Quick Stop. (Tr. 116.) Gibson claims that she and her employer agreed it would be best if she quit because she was having severe anxiety attacks, migraines, and dizziness every time she worked (Tr. 98); however, her employer believed she left to pursue other employment. (Tr. 116.)

Gibson alleges that she can no longer work due to major depressive disorder, obsessive-compulsive disorder, panic disorder, and obesity. (Opening Br. of Pl. in Social Security Appeal 2.) Because Gibson does not dispute the ALJ's findings regarding her obesity, the Court will focus its inquiry on those findings pertaining to her mental conditions.

Records from Doctor Teresa Tallon, Gibson's primary care physician, date back to November 1995, but Dr. Tallon did not treat her for any mental conditions until February 2, 2000, the day after Gibson went to the emergency room for a migraine purportedly caused by stress. (Tr. 147, 149, 170.)

On a March 16, 2000, visit to Dr. Tallon, Gibson reported suffering from stress-induced anxiety attacks lasting two to twelve hours and wanted a higher dosage of the Buspar that Dr. Tallon prescribed on February 2, as it was relieving her symptoms. (Tr. 145.) Dr. Tallon diagnosed anxiety attacks and prescribed Prozac and a higher dose of Buspar. (Tr. 145.) Gibson reported good results with these drugs on June 12, and did not visit Dr. Tallon again until September 26, 2001, complaining of problems with headaches, emotions, anxiety, paranoia, and obsessive-compulsive episodes. (Tr. 144-45.) Dr. Tallon prescribed Zyprexa. (Tr. 144.)

Because Gibson experienced side effects, Dr. Tallon took her off of Zyprexa and prescribed Luvox on October 25, 2001, suggesting a potential need for psychiatric treatment if Luvox did not help. (Tr. 144.) On November 8, Gibson informed Dr. Tallon that she was doing "wonderful" on Luvox, and on December 6, Dr. Tallon increased the dosage due to a breakthrough anxiety attack, but Gibson reported that she was otherwise "doing very well." (Tr. 143.) She again reported "doing well with the Luvox" on January 10, 2002. (Tr. 143.)

During Gibson's February 19 visit, Dr. Tallon filled out a "Report of Psychiatric Status" for the state agency, reporting a diagnosis of obsessive-compulsive disorder, anxiety attacks, inability to tolerate stress, and migraine headaches. (Tr. 135-36.) Dr. Tallon opined that although Gibson suffered from these disorders her whole life, her symptoms were "less exacerbated when she was busy working." (Tr. 138.) Even though Dr. Tallon gave a current prognosis of "fair to poor," she reported that Luvox helped Gibson. (Tr. 141.)

On April 3, Gibson complained that her symptoms were worsening due to increased stress, so Dr. Tallon increased the Luvox dosage. (Tr. 135.)

Doctor Daniel Hauschild performed a consultative examination of Gibson on April 19,

2002, at the request of the Indiana Disability Determination Bureau. (Tr. 122-26.) Gibson described panic attacks during which she sweats, shakes, loses her vision, gets dizzy, cannot feel her face or arms, and fears she is going crazy. (Tr. 122.) She explained that sometimes these attacks occur after she has gone into "a rage," that she has a migraine afterwards, and that Luvox helped to prevent these emotional outbursts and anxiety attacks. (Tr. 122-23.)

Expressing feelings of worthlessness and hopelessness, Gibson claimed she is occasionally suicidal. (Tr. 122.) Because she fears separation from her son and that people laugh at her, Gibson alleged she avoids leaving her home, yet she also reported an ability to shop by herself. (Tr. 122-23.) Gibson claimed she spends her day at home taking care of her son, cooking, cleaning, and performing compulsive rituals such as checking her animals for fleas, tracing words and shapes, and picking sores. (Tr. 122-23.)

The results of Dr. Hauschild's mental status exam were normal, except that Gibson rejected the serial sevens task. (Tr. 124.) Furthermore, he found her facial expression calm, her affect appropriate, her intellectual functioning normal, and her thought processes logical. (Tr. 125.) Dr. Hauschild opined that she had obsessive-compulsive disorder; recurrent, mild, major depressive disorder; and panic disorder without agoraphobia, and rated her Global Assessment of Functioning ("GAF") at 50.[3] (Tr. 126.)

On May 16, 2002, J. Gange, Ph.D., reviewed the record for the state agency and determined that Gibson had affective and anxiety-related disorders. (Tr. 183.) Noting that Gibson had not received treatment from a mental health professional and that medication was

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000) (hereinafter *DSM-IV-2000*).  A GAF of 50 reflects "serious symptoms" or "any serious impairments in social, occupational, or school functioning." *Id.* at 34.

effective, Dr. Gange opined that Gibson was not significantly limited in thirteen out of twenty functional areas, and only moderately limited in the remaining seven. (Tr. 193, 199-201.) Dr. Gange further opined that Gibson had the mental residual functioning capacity to complete simple repetitive tasks. (Tr. 201.) F. Kladder, Ph.D., concurred with Dr. Gange's report. (Tr. 183, 201.)

Gibson sought psychiatric treatment at the Northeastern Center on September 13, 2002, where Sarah Lobacz, a staff therapist, performed an "Initial Clinical Assessment." (Tr. 179-82.) Gibson described essentially the same problems as before, adding that she recently separated from her husband after he had an affair with her former best friend. (Tr. 179-80.) She also described being molested by her mother's boyfriend and her sister's husband. (Tr. 179.) Because her anxiety interfered with past jobs, Gibson reported a poor work history. (Tr. 179.) Lobacz opined that unresolved traumatic experiences and marital stress affected Gibson's insight and judgment and diagnosed anxiety disorder, obsessive-compulsive disorder, sleep disturbances, overeating, low back pain, and panic attacks, giving a GAF score of "60/60."[4] (Tr. 180.)

Gibson visited Dr. Tallon on September 16, reporting that she was still doing well on the Luvox and that she started counseling. (Tr. 130.)

On October 3, Lobacz met with Gibson to prepare a treatment plan, rating her GAF as "60/60." (Tr. 175-177.) Doctor Fred Lipovitch, a psychiatrist, reviewed and signed the plan to verify its medical necessity. (Tr. 177.) Lobacz also counseled Gibson on October 24 and 31, and November 7, focusing on Gibson's feelings surrounding her divorce. (Tr. 172-76.)

---

[4] A GAF of 60 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *DSM-IV-2000* at 34.

5

On December 16, Gibson told Dr. Tallon she is starting to feel better. (Tr. 212.)

On April 3, 2003, Lobacz and Gibson developed an "Integrated Services Plan." (Tr. 234-36.) Lobacz opined that Gibson's GAF was 55,[5] and Dr. Lipovitch reviewed and signed the report.[6] (Tr. 234.)

Dr. Lipovitch performed his own "Initial Psychiatric Evaluation" on June 5. (Tr. 232-33.) Gibson complained of the same disorders and symptoms, claiming she was unable to work due to migraines and anxiety. (Tr. 232.) Dr. Lipovitch observed that Gibson's facial expression was tense and confused; her mood was anxious, agitated, and fearful; her affect was flat; and she was withdrawn, suspicious, irritable, impulsive, argumentative, and assaultive. (Tr. 233.) He also noted that Gibson was preoccupied with past suicidal thoughts, had a phobia of her ex-husband taking her son away, was paranoid and very self-conscious, and had no motivation. (Tr. 233.) Diagnosing her with recurrent major depression and obesity, Dr. Lipovitch identified Gibson's ex-husband, sister's husband, and money as stressors and opined a GAF of 30.[7] (Tr. 233.)

On July 24, Lobacz and Gibson conducted an "Integrated Services Plan Review," where Lobacz noted a GAF of 65.[8] (Tr. 229.) Once again, Dr. Lipovitch signed the review. (Tr. 229.)

From June 2003 to February 2004, Gibson regularly attended therapy sessions at

---

[5] A GAF score of 55 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *DSM-IV-2000* at 34.

[6] This report indicates that Gibson's initial GAF in September 2002 was 45 but offers no explanation for the change. (Tr. 234.)

[7] A GAF score of 30 means that the individual's "behavior is considerably influenced by delusions or hallucinations, [the individual experiences] serious impairment in communication or judgment," or the individual has an "inability to function in almost all areas." *DSM-IV-2000* at 24.

[8] A GAF score of 65 reflects "some mild symptoms . . . [or] some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well." *DSM-IV-2000* at 34.

Northeastern Center. (Tr. 214-231.) Lobacz conducted at least nine of these sessions, opining a GAF of 65 on November 13, 2003. (Tr. 214, 217-18, 220-25, 227.) Gibson also saw Erin Rivera on October 10, 2003, December 12, 2003, and January 1, 2004. (Tr. 215-16, 219, 226.)[9]

On March 9, 2004, Dr. Lipovitch provided a "Medical Source Statement" to the state agency, indicating that a nurse practitioner saw Gibson "with the frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [her] medical condition(s)." (Tr. 204.) Dr. Lipovitch affirmed his diagnosis of recurrent major depression and obesity, and opined that Gibson's current GAF and highest GAF for the past year was 65. (Tr. 204.) Reporting Gibson's partial response to treatment, Dr. Lipovitch noted her prognosis was "poor for full recovery." (Tr. 205.)  He rated her ability to perform sixteen work-related mental activities as either "fair" or "poor," with only six activities receiving either an "excellent" or "good" rating. (Tr. 207-08.) Dr. Lipovitch found that Gibson would miss work one or two days a week due to poor tolerance of stress. (Tr. 206.)

At the administrative hearing on March 18, 2004, Gibson testified that any stress causes her to have panic attacks. (Tr. 245.) Although she felt she was able to handle the stress of being a mother, she thought working was even less stressful than motherhood. (Tr. 245-46.) Gibson's mother testified that Gibson did not like to be separated from her son and that Gibson requires her help in raising her son, but that Gibson was "a good mother." (Tr. 251-54.) Furthermore, her mother believed that Gibson was previously able to work because she usually had a relative or friend working with her. (Tr. 257.)

Gibson originally filed concurrent claims for SSI and DIB on November 13, 2001,

---

[9] The record does not reveal Rivera's professional title.

alleging a disability onset date of June 1, 1999. (Tr. 44-46.) The Social Security Administration's

Field Office adjusted the onset date to October 1, 2001. (Tr. 57.) ALJ Bryan Bernstein conducted

a hearing on March 18, 2004, and rendered an unfavorable opinion on November 9, 2004. (Tr.

10-12, 241.) The Appeals Council denied Gibson's request for review. (Tr. 4-6.) Gibson filed

here on August 1, 2001, seeking review of the Commissioner's decision, and the matter is now

fully briefed.

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act ("Act") grants this Court "the power to enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing

the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42

U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

supported by substantial evidence, which means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th

Cir. 2004). The decision will be reversed only if it is not supported by substantial evidence or if

the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp

of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

8

# IV. DISCUSSION

*A. Legal Framework*

Under the Act, a plaintiff is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

In determining whether Gibson is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[10] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with

---

[10] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

*B. The ALJ's Decision*

In a written decision issued on November 9, 2004, the ALJ determined that Gibson was not disabled. (Tr. 13-22.) The ALJ decided in Gibson's favor on steps one and two, finding that Gibson's mental impairments were severe, but also finding that she did not meet a listing at step three. (Tr. 21-22.) He then ascertained that Gibson had an RFC that would accommodate work activities. (Tr. 22.) Based on this RFC, the ALJ found at step four that Gibson could not perform her past relevant work. (Tr. 22.)  However, relying on the testimony of a vocational expert, the ALJ found at step five that Gibson was capable of performing work in the national economy. (Tr. 22.) Therefore, Gibson was not entitled to SSI or DIB. (Tr. 22.)

In reaching this decision, the ALJ did not accord great weight to the opinion of Dr. Lipovitch, finding that his evaluations of Gibson were not thorough, his use of the GAF was unreliable, and his assessments were based on conjecture and speculation. (Tr. 18-19.) Likewise, the ALJ gave little or no weight to the opinion of the consulting psychiatrist, Dr. Hauschild, finding that Dr. Hauschild relied on Gibson's subjective complaints rather than "his own critical insights." (Tr. 19.) Furthermore, the ALJ discredited Gibson's accounts of her physical limitations, concluding she "demonstrates significant personal strengths." (Tr. 16.)

Gibson advances four arguments for reversal: (1) the ALJ's misunderstanding of the structure of mental health treatment and of the use of GAF scores led him to improperly evaluate the opinion of Dr. Lipovitch; (2) he used inappropriate reasons to discredit the opinion of Dr. Hauschild; (3) he erroneously "played doctor" by substituting his own judgment for those of

10

examining doctors; and (4) he improperly discredited Gibson's testimony by equating her ability to care for her son with an ability to work outside the home. These arguments will be discussed in turn.

### C. The ALJ's determination that Dr. Lipovitch's opinion is not entitled to great weight is supported by substantial evidence

The opinion of a treating physician should be given great weight in disability determinations because of his or her greater familiarity with the claimant's conditions and circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). More specifically, if the ALJ finds that the treating physician's opinion is "well supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record," the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

In the event the treating physician's opinion is not given controlling weight, the Commissioner applies the following factors used to determine the weight given to any medical opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," because "a treating physician may bring biases to an assessment." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Commissioner, not a doctor selected by a patient to treat him,

11

decides whether a claimant is disabled. *Id.*; 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, the ALJ did not accord great weight to the medical opinion of psychiatrist Dr. Lipovitch, noting that "Dr. Lipovitch apparently does not see the claimant for thorough evaluations, but merely offers his endorsement of the work of others."[11] (Tr. 18.) Gibson counters with evidence that Dr. Lipovitch performed psychiatric evaluations of her on June 5, 2003, and July 16, 2003, and reviewed her therapist's reports to verify medical necessity, arguing that Dr. Lipovitch acted not merely as an endorser, but as the "head of a treatment team of mental health professionals [who treated] all of the needs of the patient."[12] (Pl.'s Opening Br. 16.)   Gibson cites *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003) and *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003) to support her contention that the ALJ misunderstood the structure of mental health care treatment; however, these cases only lend more credence to the ALJ's determination. Although both cases stand for the proposition that the ALJ cannot simply dismiss the opinion of a psychiatrist whose role is limited to heading a treatment team, both also conclude that the ALJ must consider the factors listed *supra* when determining the weight to give the opinion. *See Benton* 331 F.3d at 1041 (concluding that it was

---

[11] From this quote, it appears that the ALJ did not regard Dr. Lipovitch as Gibson's treating physician. This designation does not matter because, as will be discussed *infra*, substantial evidence reveals that Dr. Lipovitch's opinions were not well-supported and were inconsistent. 20 C.F.R. § 404.1527(d)(2).

[12] Contrary to Gibson's assertions, the ALJ did not disregard Dr. Lipovitch's two evaluations, remarking that Dr. Hauschild, who examined Gibson only once, had less opportunity to evaluate Gibson than Dr. Lipovitch. (Tr. 19.)

the ALJ's responsibility to explore the nature of the treatment relationship when determining what status to give the psychiatrist's opinion); *Shontos* 328 F.3d at 426-27 (giving greater weight to the opinions of members of a mental health care team, which included a psychiatrist, a nurse practitioner, and a therapist, because they were consistent with each other).

The ALJ properly considered the frequency of examination and the nature and extent of the treatment relationship between Dr. Lipovitch and Gibson. While discrediting Dr. Lipovitch's opinion as not thorough, the ALJ lauds other members of the Northeastern Center team as the "real examiners." (Tr. 19.) Indeed, the record reveals that therapist Lobacz saw Gibson no less than fifteen times, while Dr. Lipovitch saw Gibson only twice. By Dr. Lipovitch's own admission, it was a nurse practitioner, not himself, who saw Gibson "with the frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [her] medical condition(s)"[13] (Tr. 204.) Contrary to Gibson's arguments, opinions of a medical source who has not frequently or extensively examined the patient are exactly the opinions the ALJ should discount in favor of opinions of a medical source who has personally treated the claimant over a period of time. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books*, 91 F.3d at 979.

The ALJ also discounts Dr. Lipovitch's opinion because of its inconsistencies, finding his use of the GAF unreliable. The ALJ observed that Dr. Lipovitch's March 9, 2004, GAF score of

---

[13] The ALJ also opines that this admission by Dr. Lipovitch "reveals the level of his neglect as he identifies the attending staff as nurse practitioners when in fact they are licensed social workers." (Tr. 19.) Gibson believes that this statement is further evidence of the ALJ's misunderstanding of the division of labor in a mental health care team, arguing that a nurse practitioner, Erin Rivera, provided medications to Gibson. Gibson's argument is not persuasive, as the ALJ could reasonably conclude that if Dr. Lipovitch was thorough, he would have identified a therapist in his response. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). First, Rivera met with Gibson only three times while Lobacz met with Gibson fifteen times. Additionally, there is no evidence that Gibson was treated by a nurse practitioner, as Rivera was never identified as such in the record.

65 reflects a "remarkable change" in Gibson's status since her June 5, 2003, GAF of 30, noting that a GAF of 65 is more consistent with the rest of the record.[14] Indeed, no other medical source reported such a low GAF score, as the record reveals GAF scores of 50 given by Dr. Hauschild on April 19, 2002;[15] 60 given by Lobacz on September 13, 2002; 60 given by Lobacz on October 3, 2002; 55 given by Lobacz on April 3, 2003; 65 given by Lobacz on July 24, 2003; and 65 given by Lobacz on November 13, 2003.[16] Furthermore, the ALJ found that the level of functioning accorded to Gibson should coincide with that found by the "real examiners at the Northeastern Center," who rated Gibson's GAF at 65. (Tr. 19.) As discussed *supra*, the ALJ properly gave credence to Lobacz's GAF scores, as she frequently counseled Gibson. *See* 20 C.F.R. § 404.1513(d)(1) ("[W]e may also use evidence from other [medical] sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include . . . therapists.")

The ALJ also discredits Dr. Lipovitch as internally inconsistent, opining that although he gave a GAF of 65 in his "Medical Source Statement," consistent with "*[s]ome mild* symptoms . . . [or] *some* difficulty in social, occupational, or school functioning," *DSM-IV-2000* at 34

---

[14] Gibson disputes any suggestion that her GAF scores demonstrate improvement, arguing that an individual's level of functioning can vary over time, that Dr. Lipovitch's prognosis was poor for full recovery, and that Dr. Lipovitch opined that her response to treatment was only partial. Her GAF scores for the last eight months of treatment, however, provide substantial evidence of improvement, as all scores were 65. *DSM-IV-2000* at 32 (GAF scores are useful in measuring the impact of treatment.).

[15] As will be discussed *infra*, substantial evidence supports the ALJ's determination that Dr. Hauschild's opinion, including his GAF score, was not entitled to great weight.

[16] Gibson argues that Dr. Lipovitch's GAF of 30 is not inconsistent, explaining that GAF scores are merely a "snapshot picture" of a patient's level of functioning at the time of an evaluation. She claims that because an individual's level of functioning can vary over time, she could have indeed been functioning at a level of 30 at the time of Dr. Lipovitch's evaluation. But even if the Court credits this GAF score, substantial evidence still supports the ALJ's finding of "not disabled." Because the Act requires that disabling symptoms last continuously for a year, *see* 20 C.F.R. § 404.1505(a), a single, low GAF score is not enough to overturn the ALJ's decision.

(emphasis added), Dr. Lipovitch also noted that Gibson would miss one or two days of work per week and rated her ability to perform most work-related activities as either "fair" or "poor."

Gibson counters that a GAF score is an *average* of a patient's psychological, social, and occupational functioning, claiming, therefore, that she could potentially have a high GAF score if her psychological and social functioning were high, despite low occupational functioning. It appears, however, as though the opposite is true, as a GAF score reflects the *worse of* the patient's symptom severity or level of functioning, which is defined on the GAF scale as level of impairment in social, occupational, *or* school functioning. *DSM-2000-IV* at 33-34.[17] The Manual's use of "or" suggests a choice from among the worst type of functioning, not an average. Therefore, if Dr. Lipovitch thought Gibson was unable to work, he could have selected a low GAF score reflecting a low level of occupational functioning without regards to her school or occupational functioning.

Substantial evidence also supports the ALJ's finding that Dr. Lipovitch's was not well-supported, as it was not based on "testing or trial efforts." (Tr. 19.) For a medical opinion to be well-supported, it must reference clinical signs and findings that support the opinion, and not rely merely on plaintiff's subjective statements. *See Butera v. Apfel*, 173 F.3d 1049, 1057 (7th Cir. 1999). The state agency form provided to Dr. Lipovitch asked him what supported his assessment of Gibson's inability to perform work-related activities. (Tr. 208.) Dr. Lipovitch responded by mentioning Gibson's poor history of functioning in school and previous employment. (Tr. 208.)  As Dr. Lipovitch did not report what that history was, how it was poor, or why that history supported his opinion about work restrictions, he presumably relied on

_____

[17] For example, a GAF of 65 reflects "some mild symptoms . . . OR some difficulty in social, occupational, *or* school functioning." *DSM-2000-IV* at 34 (emphasis added).

Gibson's subjective complaints. *See Butera*, 173 F.3d at 1057.[18]

*D. The ALJ's decision to assign little or no weight to Dr. Hauschild's opinion is supported by substantial evidence*

When determining the weight given to any medical opinion, including that of a consulting examiner, the ALJ considers the following factors: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); 20 C.F.R. § 416.927(d).

Here, the ALJ found the GAF score of 50 given by the consulting examiner, Dr. Hauschild, was not persuasive, therefore "impair[ing] the weight accorded to his report." (Tr. 19.) The ALJ first noted that Dr. Hauschild had "even less opportunity" to evaluate Gibson than Dr. Lipovitch. *See* 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Additionally, the ALJ opined that if Dr. Hauschild would have relied on his own observations and critical insights, rather than Gibson's subjective complaints, his GAF score would have been higher, pointing to the following "signs of strength that are inconsistent with this score": Gibson's "considerable, productive, daily activities, responsible participation in counseling, a history of employment, and adequate cognitive function." (Tr. 19.)

---

[18] Contrary to Gibson's arguments, the ALJ met the burden of minimal articulation when he determined that Dr. Lipovitch's opinions were conjecture and speculation because they were not based on testing or trial efforts. While the ALJ has a duty to "minimally articulate his . . . justification for rejecting or accepting specific evidence of disability," he is not required to "provide a written evaluation of every piece of evidence that is presented." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

16

Gibson attacks each observation on the list, arguing that an item individually does not undermine Dr. Hauschild's low GAF score. For example, she argues that even though her cognitive functioning is intact, this does not undercut Dr. Hauschild's opinion because "it is her emotional functioning that is in question not her ability to think." (Pl.'s Opening Br. 19.) Gibson's cognitive functioning, however, was just one piece of the puzzle; when taken as a whole, these objective observations provide substantial evidence for upholding the ALJ's decision to discredit Dr. Hauschild. *Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001) ("When determining whether substantial evidence exists, we review the record as a whole.")

In addition to Gibson's intact cognitive functioning, the ALJ found Dr. Hauschild's low GAF score inconsistent with his remarks about her considerable, productive daily activities. Gibson argues that her ability to be productive part of the day is not necessarily inconsistent with an ability to sustain work for eight hours a day, particularly in light of her obsessive rituals and her minimal ability to function outside of her home. Her argument, however, mischaracterizes the ALJ's opinion, as he does not equate an ability to do household chores with an ability to sustain work. Instead, he notes that Dr. Hauschild's low GAF score, an assessment based on many factors regarding her ability to function, is inconsistent with objective evidence that Gibson is able to function on a daily basis.

The ALJ further discredits Dr. Hauschild's low GAF score because Dr. Hauschild noted Gibson's employment history. Gibson argues that the ALJ wrongly considered her employment history, as her history is one of short-term jobs, some of which were negatively affected by or lost due to her mental problems. Gibson, however, admits that some of these jobs were only short-term because she was employed through a temporary agency. (Tr.  248.) Additionally, the

17

record provides no evidence that she was ever fired due to her alleged mental conditions.[19] She claims to have quit at least three jobs due to anxiety attacks, but the only employer to report to the state agency believed Gibson quit her job to pursue other employment. Thus, the ALJ properly considered her employment history when discrediting Dr. Hauschild.[20]

### E. The ALJ was not "Playing Doctor"

Gibson, citing *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996) and *Wilder v. Chater*, 64 F.3d 335, 337-38 (7th Cir. 1995), argues that the ALJ improperly "played doctor" by substituting his own judgment for that of Dr. Lipovitch and Dr. Hauschild, thereby "discounting the only examining doctors of record." (Pl.'s Opening Br. 18-19.)  In *Rohan*, the court reversed and remanded the case because it was "unable to discern how–apart from substituting his own judgment for that of the medical witnesses–the ALJ reached his determination regarding the degree of Rohan's impairments . . . ." 98 F.3d at 971.  Here, in contrast to *Rohan*, the ALJ made it clear in his determination that he relied on other objective medical evidence in making his decision.

Especially revealing is the ALJ's reliance on Dr. Tallon's reports. While not a psychiatrist, Dr. Tallon had been Gibson's doctor since 1995, treating her on numerous occasions for mental health problems. In her "Medical Source Statement," Dr. Tallon opined that

---

[19] The record reveals two jobs that Gibson did not leave of her own volition; she was laid off from one job and was fired from another for spreading rumors.

[20] Gibson makes much of the ALJ's comment that Dr. Hauschild's low GAF score should be discredited, because "he remarked about her . . . responsible participation in counseling." (Tr. 19.) The Court agrees that it was improper for the ALJ to use Gibson's participation in counseling as evidence of her ability to function. *See Jones v. Apfel*, 997 F. Supp. 1085, 1092 n.16 (N.D. Ind. 1997) ("[F]ewer people would actually seek treatment if the very fact of obtaining mental health treatment becomes a basis for a finding of not disabled.") This comment, however, is not fatal to the ALJ's decision, because, as discussed *supra*, there is substantial evidence to support his decision to discredit Dr. Hauschild.

although Gibson had suffered from mental health disorders her entire life, her symptoms were "less exacerbated while she was busy working." (Tr. 138.) Furthermore, the ALJ properly relied on the opinion of Lobacz, who had counseled Gibson no less than fifteen times and had never given Gibson a GAF lower than 55. Opinions of medical sources who have frequently treated Gibson are exactly those to which the ALJ should give credence. *White v. Barnhart*, 415 F.3d 654, 658-59 (7th Cir. 2005) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003); 20 C.F.R. §§ 404.1527(d)(2)(i) & (d)(5)) ("Indeed, it is difficult to think of [a] more appropriate factor[] than a physician's . . . familiarity with the patient and his medical history when determining how much weight to assign to his opinions.")

*F. The ALJ's determination that Gibson was not credible is supported by substantial evidence*

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination generally will not be overturned unless it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If, however, the reasoning behind the ALJ's credibility determination "does not build an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), this Court must remand because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness." *Carrandine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2000).

The ALJ opined that Gibson's "assertions about her capacity . . . are not reliable. . . . [D]espite her self-perception as a weak person, she demonstrates significant personal strengths . . . . ." (Tr. 16.) Because the ALJ noted that one of these "personal strengths" is Gibson's ability to take care of her child, Gibson leaps to the conclusion that the ALJ improperly equated the ability to care for a child with the ability to work, arguing that she requires assistance from her mother

in raising the child and that her fear of being separated from her son keeps her from working. Contrary to Gibson's arguments, the ALJ specifically *did not* equate her ability to take care of her son with an ability to work, noting, "the failure of the claimant to provide reliable testimony [about her personal strengths] does not show that she is unimpaired." (Tr. 16). Instead, a more reasonable interpretation is that the ALJ is merely opining that Gibson's ability to take care of her son demonstrates that her portrayal of herself as unable to handle "any sort of stress" is not entirely accurate in light of her admission that child care is more stressful than working. (Tr. 245.)

Furthermore, the ALJ explains that a family court judge previously awarded Gibson custody of her child, concluding that if her accounts of her mental disabilities are believable, the judge would not have awarded her custody as she would not have the mental capacity to raise a child. Gibson argues this is improper speculation, citing *White ex rel. White v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) for the proposition that "a decision based on speculation is not supported by substantial evidence." That case hinged upon whether a disabled child had excess resources precluding his entitlement to benefits. *Id.* at 373. The Seventh Circuit concluded that the ALJ engaged in improper speculation when he deemed a conservatorship account to be excess resources, and thus available to the child, by finding that the probate judge *might have* released the funds *if* the child's mother would have sought a release more vigorously. *Id.* at 375. In other words, the ALJ had heaped speculation on top of speculation.

In contrast, here the ALJ did not speculate about what the family court judge *might have done*; we know what the judge did–he awarded Gibson custody. Instead, the ALJ reasonably inferred from this award of custody that Gibson was a fit mother who had the mental capacity to

take care of her child. *See, e.g.*, *Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) ("The ALJ was entitled to make reasonable inferences from the evidence before him . . . ."). Based on this inference, the ALJ found that Gibson's claim that her mental impairments prevented her from handling all stressful situations lacked credibility.

## V. CONCLUSION

In sum, the ALJ's determinations that Dr. Lipovitch's opinion was not entitled to great weight and that Dr. Hauschild's opinion was entitled to little or no weight are supported by substantial evidence. When making these determinations, the ALJ did not improperly "play doctor." Furthermore, his credibility determination with respect to Gibson's testimony was also supported by substantial evidence. For these reasons, the Commissioner's final decision is hereby AFFIRMED. The clerk is directed to enter a judgment in favor of the Commissioner and against Gibson. SO ORDERED.

Enter for December 14, 2005.

S/ Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge